[Civ. No. 11131.   Third Dist.   July 14, 1966.]

STATE OF CALIFORNIA ex rel. STATE PUBLIC WORKS BOARD, Plaintiff and Respondent, v. JESSE B. WHITLOW et al., Defendants and Appellants.

McPherson, Mulkey & Aisthorpe and Robert W. Aisthorpe for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Williard A. Shank, Assistant Attorney General, William T. Chidlaw, William Mayhew and Robert E. Capron, Deputy Attorneys General, for Plaintiff and Respondent.

PIERCE, P. J.—Included in 82 and a fraction acres of defendants' (Whitlows') lands condemned by the state were 37.55 acres already under lease to the state. The jury found the fair market value of all land taken to be $67,110 with no severance damages to adjoining land not taken; it also found $12,034 as the value of the leasehold interests already owned by the state, leaving a net recoverable sum of $55,076. The Whitlows' appeal raises this contention: Nothing should have been deducted from the state's leasehold interests which (appellants urge) became "merged with the fee" at the time of the filing of the complaint. Assuming *arguendo* that the leasehold values can be considered at all, the Whitlows also contend: Optional extension periods in the state leases should not have been considered, and an improper method of valuing the leasehold interests was adopted. They further contend: State appraisal witnesses were improperly allowed to adopt "speculation" as the highest and best use of the property in their evaluations.

We uphold the trial court's judgment against all the above contentions.

The subject property, generally classified as "cut-over" timber lands with some small fir and pine trees remaining, is located near Magalia, Butte County. The land taken was part of a larger tract totaling 122 plus acres. As of September 1, 1949, the state had leased 20.2 acres of this land for a 20-year term ending August 1, 1969, with an option in the state to renew the term for an additional 25-year term (i.e., until August 31, 1994). As of August 1, 1952, a second lease to the state of 17.35 acres, also for a 20-year term ending July 31, 1972, was entered into. This lease contained an option of renewal for an additional term ending September 1, 1977. Each lease provided for annual rentals of $300 for both the original

and renewal terms. The leases forbid assignment but permit subletting.

Although both leases authorize use expressed in broad terms "for the purpose of conducting therein the business of the State," they are actually used jointly by the State Department of Conservation, Division of Forestry, and Department of Corrections as a part of "an honor farm and conservation project." Inmates also work for the State Departments of Fish and Game and Parks and Recreation, Division of Beaches and Parks. Improvements placed upon the leased property by the state have cost $257,000 and have a replacement value of $404,000.

The land condemned was for expansion—to increase the size of barracks, for mess hall facilities and new equipment sheds. The state decided, in addition to acquiring the additional lands for the purpose described, to condemn the reversionary interest of the Whitlows.

Re: *The Contention that the State's Leasehold Interest "Merged" (i.e., terminated) When the Complaint was Filed.*

The Whitlows' proposition is: (1) that when a tenant acquires his landlord's title there is a merger of the leasehold interest with the fee; (2) that although ordinarily in a condemnation action *acquisition* does not occur until the final order of condemnation (Code Civ. Proc., § 1253[1]), an *exception* exists *when the condemner takes possession at the outset of or pending the proceedings (People* v. *Peninsula Title Guar. Co.,* 47 Cal.2d 29 [301 P.2d 1]; *People* v. *Joerger,* 12 Cal.App.2d 665 [55 P.2d 1269]), and in that event the taking effectually takes place at the time of the physical taking and does not await the formal divestiture of title; therefore (3) the same rule must apply here because the state was already in possession under its leases and had made extensive improvements changing the "status" of the lands before the commencement of condemnation.

Unimpressed by the ingenuity of the Whitlows' argument, the trial court denied its applicability. It ordered that "merger" took place only when divestiture of title occurred upon

[1]Code of Civil Procedure section 1253 in relevant part provides: ". . . The title to the property described in the final order of condemnation vests in the plaintiff for the purposes described therein upon the date that a certified copy of the final order of condemnation is recorded in the office of the recorder of the county."

the final order of condemnation. ■ The judge also instructed the jury that in awarding the Whitlows just compensation it must subtract the value of the leasehold interests already owned by the state when the proceedings began.

The trial court was right. Whitlows' postulated theory ignores both the law and equity. It ignores equity because it requires the condemner to pay twice for the leasehold interest. In other words, it requires the state to buy again that which it has already bought *and paid for*.

Nor does the law command so inequitable a result. For authority the Whitlows' reliance is solely upon the *Joerger* and *Peninsula* cases cited *supra*. In both those cases the condemners who took possession had had no prior interest in the property. In neither case was the controversy between condemnee and condemner. In the *Joerger* case, *supra*, 12 Cal. App.2d 665, the controversy was between the condemnee and a trust deed holder-purchaser at a trustees' sale as to who was the *"owner"* entitled to the condemnation award deposited into court by the condemner. The court held the entire award to be payable to the condemnee.

*People* v. *Peninsula Title Guar. Co., supra,* 47 Cal.2d 29, involved the question whether the owner-condemnee should be required to pay out of the condemnation award a special benefit assessment of a city which became due after the state-condemner had obtained an order and had taken possession of the condemned land but before there had been a divestiture of title under the final order of condemnation. Finding that the condemnee would derive no benefit from the assessment the Supreme Court reversed a trial court order charging the condemnee's award with the amount of the assessment. Simply stated, in both the *Joerger* and *Peninsula* cases the court refused to apply the divestiture-of-title-only-upon-order-of-condemnation rule under circumstances where it would be *inequitable* to do so.

■ No compulsion to create an exception prompted by equitable consideration applies in this case. Here the state *did* have a prior interest in the property which it had already bought and paid for. It was not giving up that interest when it elected to acquire Whitlows' interest. By its complaint it expressly so stated. It exercised its power of eminent domain *not* to buy an entire fee. Whitlows did not own that. All they owned, and all the state had to "take" (and pay "just compensation" for) was what the condemnees had left, to wit: (a) a landlord's interest in the lease, and (b) a reversionary

interest in the property (which was a right to retake possession and enjoy full ownership only upon the termination of the leases). When those two rights and interests were fairly evaluated and the sum representing such values paid, the condemnees received the "just compensation" to which they were constitutionally entitled. (Cal. Const., art. I, § 14.) They were entitled to no more. (See *Federal Oil Co.* v. *City of Culver City,* 179 Cal.App.2d 93, 99 [3 Cal.Rptr. 519].)

Two other cases cited by the Attorney General illustrate the refusal of the courts to apply the exception to the general rule under circumstances where to do so would be to make an exception born to serve equity *inequitable*: *Consumers Holding Co.* v. *County of Los Angeles,* 204 Cal.App.2d 234 [22 Cal. Rptr. 106] (where the following sequence of events had taken place (1) commencement of construction of an apartment house by the condemnee; (2) notice by the state of imminently-projected condemnation; (3) filing of the condemnation action and service of summons; (4) a stopping of construction and a tender of possession to the condemner; (5) a refusal by the condemner to accept possession until the final order of condemnation) ; *People* v. *Watkins,* 175 Cal.App.2d 182 [345 P.2d 960] (where the condemner during pendency of proceedings to condemn an easement to widen a street obtained an immediate possession order of that portion of the property which constituted a 7-foot encroachment by the condemnee built in violation of a setback ordinance).

Re: *The Contention that the Optional Renewal Provisions of the Leases Should not have been Considered in Evaluating the Leasehold Interests.*

The court, first in proceedings outside the presence of the jury, ruled and thereafter instructed the jury that in evaluating the state's leasehold interests the leases were to be considered as though the options of the state to renew had in fact been exercised and the leases ran for the full option periods.

Likening this to a situation where an option to purchase real property is involved in which it has been held that an optionee's right does not entitle him to compensation on condemnation (*East Bay Mun. Utility Dist.* v. *Kieffer,* 99 Cal. App. 240, 246 [278 P. 476, 279 P. 178] ; *People* v. *Ocean Shore R.R. Co.,* 90 Cal.App.2d 464, 469 [203 P.2d 579]), the Whitlows contend that the same rule should be applicable here and that the trial court's order and instruction were error. The

theory of the argument is that whether the options of renewal will be exercised is speculative, remote and contingent and therefore equates with the general rule forbidding the allowance of damages of such character. (*Arnerich* v. *Almaden Vineyards Corp.*, 52 Cal.App.2d 265, 272 [126 P.2d 121].)

■ In the discussion which immediately precedes this, we have shown that the state's leasehold interests must be evaluated. Both leases contain renewal options. These, like any other right of a lessee, are items which should be considered to the extent they enhance the value of the leases if a fair evaluation is to take place. (*Department of Public Works* v. *Bohne* (1953) 415 Ill. 253 [113 N.E.2d 319, 324]; see also 1 Orgel, Valuation under Eminent Domain, § 121, p. 521, fn. at p. 525.) Although consideration of options to renew have been rejected by courts in some jurisdictions (*op. cit.*, fn. p. 525), we accept as the sounder rule that they must be considered to the extent they enhance the value of the lease to be appraised.

Under some circumstances a case might exist where a serious question would arise whether an option of renewal would be exercised at all. In that instance it might be a function of the jury to determine that question. It is held in *People* v. *Russell* (1957) 48 Cal.2d 189, 195 [309 P.2d 10] : "In an eminent domain proceeding the amount of compensation is to be determined by the jury. ([Cal.] Const., art I, § 14.) All other issues are to be tried by the court. . . . (*People* v. *Ricciardi*, 23 Cal.2d 390, 402 [144 P.2d 799] and cases cited.)" ■ When, as here, the lease contains a right of renewal, we do not doubt it is the court's function to instruct the jury in fixing the value of the lease to consider the extent to which the value is enhanced by the renewal privilege. Telling the jury to assume the exercise of that option, however, is arguably a question of fact so closely identified with the ascertainment of value as to be within the exclusive province of the jury. We need not, and do not, decide that question here. Under the facts of this case, the court's instruction was proper. When the evidence is such that only one inference can be drawn, it can and must be treated as a question of law. (*Haines* v. *Bechdolt*, 231 Cal.App.2d 659, 665 [42 Cal.Rptr. 53].) Although the state had not as yet exercised its option to renew these leases, reasonable minds could not differ that it would do so. The rents payable ($300 per year) were nominal, the value of the improvements (nearly a half-million dollars) was great, the state's need for the property (manifested by the fact that it was condemning adjoining property for expansion pur-

poses) was unquestionable. No rational conclusion is possible that the state would fail to exercise its option.

Even though a concession were to be made that the trial court's ruling was error (a concession we are not prepared to make), it would have to be deemed harmless. (Cal. Const., art. VI, § 4½: *Vasquez* v. *Alameda,* 49 Cal.2d 674, 677 [321 P.2d 1].)

### Re : *The Contention that the State's Method of Appraising the Leasehold Interests was Improper.*

■ The method adopted by the state's appraisers to appraise the state's leasehold interest (approved by the court) can be stated by quoting the court's instruction : "In valuing the interests of the State of California in said leases, a proper approach in valuing each lease is as follows :

"You first determine fair market value of the property under leases as though there were no leases. You then determine the present value of the Whitlows' right to possession and use of the leased property in the future, that is, their reversionary interest. The next step is to add the present value of the right to receive the rental income over the period of the lease. These two sums represent the present interest of the Whitlows in the leased property. This sum is then subtracted from the total fair market value of the leased property. This difference represents the present interest of the State of California in the property subject to the lease."

The Whitlows' contention basically is that the value of the state's leasehold interests should have been determined by the same rules applicable as though the jury was fixing just compensation to be paid an owner of leasehold interests about to be condemned. Applying the classic willing-informed-seller and willing-informed-buyer approach (*Sacramento etc. R.R. Co.* v. *Heilbron,* 156 Cal. 408 [104 P. 979]) appellants conclude no one would or could buy the state's leasehold because of a number of factors. These included restrictions upon assignment, restrictions upon use, i.e., "conducting therein the business of the State," the right given to the state to terminate the leases, powers given the Director of Finance under the law, etc. In short, according to the Whitlows the state, already owner of these leaseholds, is to be treated as though it were buying them. They effect this legerdemain through the following formula : Step 1. The market value of the land under lease is determined as though no lease existed (this, as we have shown, was a step actually used by the state's appraisers and

included in the court's instruction quoted) : Step 2. The "contract rent," i.e., the rent called for by the leases, is determined : Step 3. The rent for which the land would lease at the time of taking "on the open market subject to all the terms, covenants, conditions and restrictions of the lease, and subject further to any law that may affect the marketability of such lease" is determined : Step 4. The "economic rent" for the full term of the lease is determined. The excess, if any, of the "economic rent" over the "contract rent," both calculated for the full term of the lease, is called the "bonus value" of such lease and, when its present value is determined in terms of money, is the market value of the leasehold interest.

It will be noted that under Step 3 (the essential portions of which we have quoted from appellants' brief) the state's leases, as the Whitlows view them, would have no market value because no informed buyer would buy a lease which, among other restrictive provisions, includes a clause that it could be used only for the state's business. Therefore, there would be no "economic rent," no bonus value, and hence no leasehold interest value.

Where the "bonus value" method is being applied to reach the "just compensation" to be paid by a condemner to the owner of a leasehold interest who is a condemnee, there is nothing wrong with it. In fact, properly applied, it reaches the same result as the "leased fee" approach applied by the state's appraisers. (American Institute of Real Estate Appraisers, The Appraisal of Real Estate (4th ed. 1964) p. 409 : Schmutz, The Appraisal Process (1959) §§ 3510-3520, pp. 263-266.) As appellants attempt to use it here, however, its result is nonsense. The state was not condemning its own leasehold interest. That was something it already owned. It was condemning the lessor's interest. The method adopted and approved by the court was correct. It is stated by Schmutz, *op. cit.*, section 3510, page 263 : ". . . The Lessor's Interest is simply : (a) The right to collect the agreed rents : in addition to, (b) The right to repossess ( and re-lease) the property at the end of the lease term. This is all. Thus, the measure of the value of the Lessor's interest is : (a) The present worth (discounted value) of the future net rents under the terms of the lease : in addition to (b) The present worth (discounted value) of the property at the end of the lease, which is called the reversionary value."

Re : *The Contention that the Trial Court Improperly Admitted Testimony that "Speculation" was a "Highest and Best use."*

■ The state's appraisers testified that comparable property in the vicinity of the subject property had had an historical highest and best use for mineral extraction or timber cutting and harvesting but that times were changing. Development for residential and recreational use such as cabins and homesites was in the offing. Prices were rising and buyers were paying more for comparable property. These purchasers had informed the appraisers they had bought not for present use themselves but to hold in anticipation of further rises in prices presaging a future residential and recreational development, this in the reasonably foreseeable future. Thus, the comparable properties in the area were in an interim stage. Sales analyses revealed a great deal of buying for speculation for development. Therefore, the state's appraisers concluded this to be the highest and best use. The Whitlows moved to strike their testimony on the grounds that "speculation" is not a highest and best use, in fact, that it was not a "use" at all.

Appellants quote from Schmutz, Condemnation Appraisal Handbook, page 9 : ". . . The most profitable use means that use which produces the greatest net return in money to land, during the foreseeable future. The use must be within the realm of reasonable probability.

"The most profitable likely legal use, within the realm of reasonable probability, to which a property can be put or adopted, and for which there is a current market."

We disagree with the Whitlows' contention that the state's method of appraisal is not within that definition. Although the state appraisers had testified to an active current market for "speculation and investment," "speculation" (to the Whitlows) was a word irreconcilably synonymous with something "remote" and "merely possible," while the word "use" to them denotes "something physical *actually being done* with the property." (Italics added.) As they see it, " 'Speculation' simply is not a 'use'." The Whitlows misuse both the words "speculation" and "use" as applied to modern concepts of land valuation in terms of "market value." Currently, the fact that farm lands, even "waste" lands, in the path of, but not quite ready for, residential or recreational development enjoy an active market, with buyers purchasing solely to hold for investment at prices based not upon any present physical usability but in anticipation of an immi-

nently-rising market, is a matter of such common knowledge that argument to the contrary is unrealistic.

Appellants cite no authority for their position. They are correct in postulating that courts will exclude from consideration mere possibilities which are so remote and unlikely they could not enhance the price at which land could be sold. (1 Orgel, Valuation Under Eminent Domain, § 31, p. 152.) But that author states (*op. cit.*, pp. 153-155) : "[W]hen the courts warn a jury against the acceptance of 'speculative values,' they apparently mean merely to prevent it from taking witnesses' predictions as if they were realities. . . . The courts draw the line at the point where it can be said that a purchaser would actually buy the property for the use in question. An appraiser must be prepared to show that the uses which he considered could actually command a price in the market. The courts have variously stated that such uses must be immediately available within a reasonable time."

The California Supreme Court adopted the view just expressed in *People* ex rel. *Dept. of Public Works* v. *Donovan* (1962) 57 Cal.2d 346, 352 [19 Cal.Rptr. 473, 369 P.2d 1] (where a future rezoning of property was a "reasonable probability.") The court held (on p. 352) : "The jury is entitled to and should consider those factors which a buyer would take into consideration in arriving at a fair market value, were he contemplating a purchase of the property [citations], and it is manifest that plausible and probable changes in the character of the neighborhood and in zoning restrictions in an area constitute such factors."

We hold that here the appraisers properly considered a present market for the use described, a use expected to materialize into actual occupancy within the reasonably foreseeable future as a "highest and best" use. The motion to strike the testimony was properly denied.

The judgment is affirmed. The purported appeal from the order denying a new trial, such order being nonappealable, is dismissed.

Friedman, J., and Regan, J., concurred.