[Civ. No. 34255. First Dist., Div. One. Apr. 28, 1975.]

RICHMOND REDEVELOPMENT AGENCY,
Plaintiff and Respondent, v.
WESTERN TITLE GUARANTY COMPANY et al.,
Defendants and Appellants.

344

COUNSEL

Phillip M. Millspaugh for Defendants and Appellants.

Fitzgerald & Johnson and Herman H. Fitzgerald for Plaintiff and Respondent.

OPINION

LAZARUS, J.*—Respondent public agency commenced this proceeding in eminent domain to acquire title to the subject property in the City of Richmond for redevelopment purposes on June 5, 1972. In the original action, the defendants were Western Title Guaranty Company, Contra Costa County Division; Nubert "Babe" Dias; E. L. McFarland; the Sumitomo Bank of California; and Does One to Twenty.

The first three parties filed an answer and cross-complaint, the latter labeled as a "Cross-Complaint in Inverse Condemnation," seeking, inter alia, loss of rental due to precondemnation activities by the agency in addition to just compensation for the property. The cross-complaint was subsequently dismissed pursuant to an order of the trial court sustaining a demurrer and motion to strike. This is a matter to which we shall revert elsewhere in this discussion.

Answers were also filed by defendant Alfred M. Dias (served as Doe Five) who had an ownership interest in the property, and by defendant State of California (served as Doe One) which occupied a portion of the real property as a tenant of the owners. The Sumitomo Bank entered into

_____

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

a settlement agreement with the agency and was thereby eliminated from the case.

A jury trial resulted in a verdict and judgment for defendants in the sum of $150,125 of which $10,000 was allotted as damages to the State of California. From this judgment, defendants Western Title Guaranty Company, Nubert "Babe" Dias, Alfred M. Dias and E. L. McFarland have appealed.

The property in question consists of 16,465 square feet of land, improved with a one-story building containing 10,900 square feet, on 14th Street and Macdonald Avenue. The appellants' appraiser witness came to the conclusion, after using three methods of appraisal, that the value of the property should be from $200,000 to $210,000. The city's appraiser testified that the value should be from $142,600 to $142,689. Further relevant facts will be more appropriately discussed hereinafter.

Our burden in connection with this appellate review has been unfortunately compounded by an utter disregard for the Rules of Court in the brief submitted on appellants' behalf. It is nothing more than what amounts to a random and somewhat garbled recital of alleged grievances, without a statement of facts, topical index, or any separate statement of points or classification of claimed errors by headings, titles, or otherwise. ■ We would be derelict in our duty if we failed to censure counsel for appellants for not even making a token attempt to comply with rule 15(a), and such failure alone would justify a dismissal of the appeal. (*Superior Sand Co.* v. *Smith,* 19 Cal.App.2d 166 [64 P.2d 1149]; *Lady* v. *Smith,* 19 Cal.App.2d 167 [65 P.2d 76].) Nevertheless, we have considered this appeal on its merits in the interests of justice.

From what we are able to glean from the record and the briefs of both parties, the issues to be determined here are as follows:

1. Did the court err in sustaining a demurrer to the appellants' cross-complaint?

2. Did the court err in instructing the jury about what may be considered by the expert witness?

3. Was there judicial misconduct?

4. Did the court err in refusing to permit testimony on the Rainey sale?

5. Should the court have ruled inadmissible certain valuation opinion on the ground the information had not previously been exchanged as required by statute?

We will discuss these points in the same order, but have found them all to be without merit.

1. *Did the court err in sustaining a demurrer to the defendants' (appellants') cross-complaint?*

Appellants' contention here is that the cross-complaint set forth two valid and distinct theories (although not separately stated) entitling them to relief and that it was not therefore subject to a general demurrer. They allegedly are (a) interference with contract (a written lease between the owners and a tenant, the Richmond Beauty College, Inc.) and (b) loss of rentals due to unreasonable delay in connection with the eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation.

(a) *Interference with contract.*

This point is merely raised without comment or argument in appellants' brief, suggesting that it may not have been seriously regarded. █ This is understandable since it is obvious from even a cursory examination of the cross-complaint (the material allegations have been set forth in the footnote below)[1] that the principle elements of the tort are conspicuously absent, *viz:* 1. elements of a valid contract; 2. cross-defendant's intent to induce breach of contract; 3. breach resulting from cross-defendant's unjustifiable or wrongful conduct. (*Bledsoe* v. *Watson*, 30 Cal.App.3d 105, 108 [106 Cal.Rptr. 197]; *Charles C. Chapman Building Co.* v. *California Mart*, 2 Cal.App.3d 846, 853 [82 Cal.Rptr. 830]; *Allen* v. *Powell*, 248 Cal.App.2d 502, 505-506 [56 Cal.Rptr. 715, 29 A.L.R.3d 1218]; *Scott* v. *McDonnell Douglas Corp.*, 37 Cal.App.3d 277, 292 [112 Cal.Rptr. 609].)

---

[1] "IV. Since January 1, 1972, or shortly before or after said date, the defendants . . . has [*sic*] placed the real property owned by the claimants into a redevelopment project and area and have threatened and have acted to take all legal steps necessary to acquire claimant's property for the purposes of the agency. Said parties have informed and stated

Thus, facts concerning only one tenant, Richmond Beauty College, were alleged. There are no allegations that respondent acted either with knowledge that there was a contract between the landlord and tenant or with intent to induce a breach of any such contract. Nor does it appear from this pleading that the beauty college was coerced by any unjustifiable or wrongful conduct by respondent when it gave written notice to terminate said lease. Liberal construction cannot serve to save this attempt to state a cause of action, since ". . . it is well settled that the presumptions are always against the pleader, and all doubts are to be resolved against him, for it is to be presumed that he stated his case as favorably as possible to himself [citations] . . . ." (*Feldesman* v. *McGovern*, 44 Cal.App.2d 566, 570-571 [112 P.2d 645].)

(b) *Loss of rental income.*

The question here is whether loss of rentals resulting from unreasonable delay or conduct are damages recoverable by cross-complaint or merely part of the just compensation award to which the property owner is entitled under the pleadings on the main action. Both parties regard *Klopping* v. *City of Whittier,* 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345], as being the pivotal case in connection with this point, but have reached opposite conclusions as to the effect of that decision in their respective briefs. A detailed analysis of that decision would therefore appear to be in order.

*Klopping* involved two consolidated inverse condemnation proceedings against the City of Whittier for diminution in the value of plaintiffs' lands due to rental losses allegedly attributable to the city's premature announcement of its intent to condemn. After the trial court sustained the city's demurrers, judgments of dismissal were entered. The Supreme Court affirmed as to one plaintiff on the ground that he was barred from

---

to claimants' tenants and to plaintiffs that plaintiffs' real property was to be taken as part of the redevelopment program of the City of Richmond and that all tenants would have to move from the premises shortly after said taking. [¶] V. That Richmond Beauty College, Inc. was a tenant of the claimants under a written lease and shortly after receiving said notice from the said Redevelopment Agency gave written notice to terminate said lease and have moved from the premises and taken with them all of their equipment, on or about the *1st* day of *February,* 1972. [¶] VI. That but for the act on the part of the said defendants said tenants would have remained as a tenant at the rate of $800.00 per month rent for ten years or more, all to the damage of the claimants. [¶] VII. That claimants will be unable to release the premises because of this threat of taking and cannot use the premises because of said acts of said Redevelopment Agency; plaintiffs cannot sell said parcel of real property because of said acts of said defendants."

recovering the damages he was seeking under the doctrine of res judicata because of his failure to claim them in the condemnation proceeding. It reversed as to the other plaintiff, whose interest in the subject property was foreclosed before the judgment in the condemnation proceeding.

Our independent scrutiny of that decision indicates however that once again appellants are not on solid ground. This seems apparent from the language of *Klopping* itself: "With regard to plaintiff Klopping, the city asserts that since his land was taken in a second condemnation action which proceeded to judgment *he should have claimed the damages he now seeks* [in inverse condemnation] *as part of his eminent domain award.* We agree. While it is true that Klopping did bring his inverse condemnation suit before the city instituted its second condemnation action the eminent domain action proceeded to final judgment first. *Since Klopping could have claimed his loss of rental income, if any, occasioned by the two precondemnation announcements in the eminent domain suit, he is barred from seeking those damages in inverse condemnation . . . ." (Klopping* v. *City of Whittier, supra,* 8 Cal.3d 39 at p. 58, italics added.)

These remarks indicate that the kind of damages sought by appellants by way of "inverse condemnation" involves issues that must under the circumstances be raised by answer to the eminent domain complaint and not by cross-complaint. This is because such damages constitute part of the eminent domain award and the just compensation payable to the property owners. While Klopping was barred from proceeding in inverse condemnation, this did not apply to the other plaintiff; however, since due to the foreclosure he no longer had an ownership interest in the property, he consequently had no standing to assert his claim at the trial of the eminent domain case.

The only significant difference between inverse condemnation and eminent domain is that ". . . in the latter the public authority takes the initiative whereas in the former it is the property owner who commences litigation. (3 Witkin, Summary of Cal. Law (7th ed. 1960) Constitutional Law, § 223, p. 2033.) *The constitutional guarantee of compensation extends to both types of cases . . . .* [¶] *In either action the constitutional standard of 'just compensation' remains the guide.* In general that standard 'is to be measured by the market value of the property . . .' at the time of the taking. [Citations.]" (*Klopping* v. *City of Whittier, supra,* 8 Cal.3d 39 at

p. 43, italics added; see also *Community Redevelopment Agency* v. *Abrams* (Cal.App.). The appellants therefore received their due.

In *People* ex rel. *Dept. Pub. Wks.* v. *Southern Pac. Trans. Co.,* 33 Cal.App.3d 960, 966 [109 Cal.Rptr. 525], the court said that where the condemner is also the zoning agency alleged to have imposed zoning restrictions to depress property value with a view to future eminent domain proceedings, the two causes should be combined in one action to recover compensation for both inverse condemnation and actual taking of the property.

In the case before us the appellants sought the type of damages that would have been obtained as part of the eminent domain award. A cross-complaint based on the same cause of action is properly struck. *People* v. *Buellton Development Co.,* 58 Cal.App.2d 178 [136 P.2d 793], for some reason cited by appellants, states that section 1246 of the Code of Civil Procedure, still in effect at the time of this suit, ". . . provides that each defendant must, *by answer,* set forth his estate or interest in the property sought to be condemned and the amount he claims as damages by reason of its taking; section 1248 declares what items of damages are recoverable, so as to include the value of the land to be taken and the damages to the remainder of any larger parcel of which it is a part. Section 1247 empowers the court to pass on conflicting claims to the property to be condemned, and section 1246.1 entitles the plaintiff to have the whole award determined as between the plaintiff and all defendants claiming any interest in the property sought to be condemned, . . . *The clear implication from the provisions which enable this to be done by answer is that no cross-complaint is to be filed for the same purpose.*" (*Id.* at pp. 183-184, italics added.) *Buellton* concerned the question of a title dispute of an easement, a more solid basis for a cross-complaint than the facts before us show, yet none was permitted. Both section 1246 and *Klopping* would lead inevitably to the same conclusion.

2. *Did the court err in instructing the jury about what may be considered by the expert witness?*

Appellants contend that the court should have instructed on BAJI No. 11.82 without leaving out subdivision 5, as it did. Subdivision

5 reads: "A witness may consider the capitalized value of the reasonable net rental value attributable to the land and existing improvements thereon." Appellants also complain that the court left out of its instructions the last words of subdivision 4, which reads: "A witness may also consider the rent and other terms and circumstances of any lease of the subject property or of a comparable property." (Omitted words underscored.) Appellants say that the court erred in its reasoning that subdivision 5 was inapplicable because of the fact that there were existing leases on the property at the time of the valuation. They argue that this distinction did not apply since they were not long-term leases, and that they also contained cancellation clauses. They state further that their witness was allowed to testify as to leases on comparable property and that evidence was introduced on comparable commercial rental data. Therefore, they say the evidence tends to support the giving of an instruction covering rentals on comparable property.

It appears from the record here that after the jury retired, the court said to the respective counsel: "Now, I would like to indicate that prior to argument, I advised counsel of the instructions that were to be given; that the property owner understood that I was using BAJI; that you had requested no special instructions; that I had indicated prior to argument that I was going to instruct them in the language of BAJI 1182 [*sic*], as opposed to 1181 [*sic*]. I further advised counsel that I was to give or was going to give a modified version of the proposed instruction by the plaintiff having to do with actual rents. [¶] . . . [To Mr. Millspaugh, counsel for appellants:] Yes, you indicated, although after argument, but prior to my instructing this jury,[2] that you request that I give that instruction [subdivision 5]. I indicated to you that in view of the fact that there were existing leases on the property at the time of the valuation, that that instruction would not be given."

Section 607a of the Code of Civil Procedure states that ". . . it shall be the duty of counsel for the respective parties, before the first witness is sworn, to deliver to the judge presiding at the trial and serve upon opposing counsel, all proposed instructions to the jury . . . . Thereafter, and before the commencement of the argument, counsel may deliver to such judge, and serve upon opposing counsel, additional proposed instructions to the jury upon questions of law developed by the evidence

[2]There is no contention that the requested instructions relate to issues which developed during argument not covered by instructions given or refused. (Code Civ. Proc., § 607a, subd. (3).)

and not disclosed by the pleadings. All proposed instructions shall be typewritten, . . ." Counsel failed to comply with these statutory requirements. ■ Such noncompliance justifies the court in refusing to give the instructions. (*Jarkieh* v. *Badagliacco,* 75 Cal.App.2d 505, 513 [170 P.2d 994]; *Arentz* v. *Blackshere,* 248 Cal.App.2d 638, 641 [56 Cal.Rptr. 809]; *Peoples* v. *Tautfest,* 274 Cal.App.2d 630, 638 [79 Cal.Rptr. 478].)

True, the court did not indicate to counsel at the time that his refusal to amplify his instructions was because of an untimely request. Instead, he stated that his ruling was based on the substantive ground that the omitted parts were inappropriate because of the existing leases on the property.

"The value of the lessor's interest is determined by ascertaining the present worth of his right to receive rent during the remaining term of the lease." (Condemnation Practice in Cal. (Cont. Ed. Bar 1973) Just Compensation: Fair Market Value, § 4.58.) In *County of Los Angeles* v. *American Sav. & Loan Assn.,* 26 Cal.App.3d 7, 9 [102 Cal.Rptr. 439], the court said that " . . . expert appraisers are virtually in unanimous agreement on the method of valuing the lessor's interest. Typical is the formula [below] . . . : [¶] '1) The *present worth* of the future net income which the lessor is to receive for the life of *the lease.*' " (Italics added; accord, *State of California* v. *Whitlow,* 243 Cal.App.2d 490 [52 Cal.Rptr. 336].) There is a suggestion in *People* ex rel. *Dept. of Pub. Wks.* v. *Lynbar, Inc.,* 253 Cal.App.2d 870, 884 [62 Cal.Rptr. 320], that reasonable rental value can be used in the capitalization approach to value only when the lease term is short or the property has no existing contract rent. (See also Condemnation Practice in Cal. *supra* (Cont. Ed. Bar) § 4.56.) The leases on this property ran considerably beyond the date of trial in 1972. One lease did not terminate until 1980, and the other until 1977.

■ Although appellants' expert did testify to certain comparable rental data, the failure of the court to give the requested added instructions in no way prejudiced appellants' case. This is so since elsewhere the court gave the instruction that "Certain matters may be considered by a witness in forming his opinion of the fair market value of the subject property, and if evidence of such matters has been received, *it may be considered by you* only for the limited purpose of enabling you to understand and weigh the testimony of the witnesses as

to their opinions of the fair market value of the subject property." (Italics added.)

There was no substantive error in the court's instructions, and appellants are in an awkward position to argue otherwise because of their belated tender of the requested instructions.

### 3. *Was there judicial misconduct?*

In his argument to the jury, counsel for appellants said at one point: "Now, the next thing that the Court will instruct you on is that a witness may consider the capitalized value of the reasonable —" The court interrupted him and the following exchange took place: "THE COURT: I'm sorry, Mr. Millspaugh, that is not the instruction the Court will give. [¶] MR. FITZGERALD [counsel for respondent]: Thank you. [¶] THE COURT: That instruction is modified, Mr. Millspaugh. That is the evil with giving instructions. I think you ought to argue the case to the jury. [¶] MR. MILLSPAUGH: That is Instruction—[¶] THE COURT: The Judge will instruct them on the law. [¶] MR. MILLSPAUGH: I understood BAJI 1182 [*sic*]—[¶] THE COURT: As modified. [¶] MR. MILLSPAUGH: Well, strike that, because I haven't seen the modification."

Counsel then continued with his argument, but without making an objection to the court's comments. The point is now raised in appellants' brief that the comments ". . . prejudiced defendants' case and prevented them from having a fair trial. Said comments by the Court misled the jury and criticized defendants' appraiser making it sound as though he was in error."

First, it does not appear how the remarks of the trial judge could give the jury the impression that the judge was criticizing the witness. Second, there is nothing about the exchange quoted above that could even remotely have been grounds for an assignment of error. In *Hickambottom* v. *Cooper Transp. Co.,* 186 Cal.App.2d 479 [9 Cal.Rptr. 276], for example, the court interrupted counsel's argument to the jury when counsel stated what he anticipated the court's instructions would be, evidently intending to refer to the last clear chance doctrine. The court admonished him in the presence of the jury not to discuss last clear chance since it had already made it clear to counsel in chambers that the court did not believe that an instruction on that subject would be applicable to the case. The appellate court could find nothing in this

incident that was either improper or prejudicial. (*Id.* at pp. 486-487.) Third, the appellants failed to object at any time during the trial or to assign the judge's conduct as error. ▮ As in the case of misconduct of counsel, the claim of misconduct of the court must ordinarily be raised at the trial by objection, assignment as error, or motion for mistrial; otherwise it will be deemed to be waived. (4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 179, p. 3000.) This is because in most instances if any of the judge's remarks were improper, an error which might have otherwise resulted therefrom can be cured by an admonition by the judge to disregard his remarks together with an instruction reminding the jury that they are the sole judges of the facts.

### 4. *Did the court err in refusing to permit testimony on the Rainey sale?*

▮ Respondent had used a comparable piece of property in its appraisal, the West Coast sale. On cross-examination of the respondent's witness, appellants' counsel sought to elicit from him his knowledge and opinion concerning the sale of what was known as the Rainey property. The Rainey property was not used as a comparable by either side. Appellants' purpose was to endeavor to show that the Rainey property had some characteristics in common with the property involved in the West Coast sale. The trial court sustained an objection to this line of inquiry, ruling that counsel might ask the witness his opinion of the value of property similar to and near the subject property, but not with regard to a property which is merely similar to a comparable.

The trial court acted correctly in refusing to admit the Rainey sale evidence. It had already permitted considerable testimony into the characteristics of that property before deciding that further evidence in this regard was not relevant. Appellants fail to show in what respect this ruling may have constituted an abuse of discretion on the part of the trial judge. Their only complaint seems to be that earlier in the trial, the court permitted respondent, overruling an objection, to cross-examine appellants' witness with regard to another transaction, the "Goines" sale. But that sale was used as a comparable so that this was proper cross-examination.

### 5. *Should the court have ruled as inadmissible certain valuation opinion on the ground the information had not previously been exchanged as required by statute?*

Section 1272.02 of the Code of Civil Procedure requires an exchange of information between parties if certain items were to be part of a witness' testimony. Among these items is a ". . . cost of reproduction or replacement of the existing improvements on the property, the depreciation or obsolescence the improvements have suffered, and the method of calculation used to determine depreciation." (Code Civ. Proc., § 1272.02, subd. (b)(6).) The replacement cost method of valuation is one of the three methods used by appraisers; it is the method of ". . . determining the value of property by calculating the cost of acquisition of an equally desirable substitute property" adjusted by depreciation (taking into account the age of the building in order to measure its present value). (Whitaker, *Real Property Valuation in California* (1967) 2 U.S.F. L.Rev. 47, 51; see also Evid. Code, § 820.)

Prior to trial the respondent's counsel exchanged certain information with appellants' counsel, stating that the reproduction or replacement cost method would not be used. At the trial however, respondent's counsel inquired, on direct examination, into the "depreciated market summation approach." Appellants objected that this was not an item listed by respondent. Appellants' claim on this appeal is that ". . . the depreciated market data is the same as the costs of reproduction or replacement of any improvements as you cannot depreciate a building until you know what its cost to reproduce is [*sic*]." Respondent answered that the depreciated market summation approach is not the same as the reproduction cost method, and the information was therefore not required to have been included on the list. Respondent claims in any event that the objection came too late; that the trial court had discretion to admit evidence not contained on the list under Code of Civil Procedure section 1272.06, and that the error, if any, was not prejudicial.

The witness' testimony on this point was brief, taking up only three pages of transcript. The witness defined depreciated market summation as ". . . really an apportionment of what part of the value is attributable to the land and what part of the value is attributable to the building. . . ." Land was valued as a separate entity. In this connection reference may be made to other bare land sales. The value of total improvements on the land is then added to the first figure to arrive at the aggregate value.

The meaning of the reproduction cost method, as explained by appellants' witness, consists of an attempt to ". . . estimate the cost new of the property, meaning its buildings, depreciate it for its age and

condition to date, and add in the land from what we were able to derive from the market data approach, because you can't build land. Land is there, and that's all we have. So the best indication of land is by what it has been selling for."

■ Respondent correctly states that depreciated market summation is not one of the approved methods for real estate appraisal, but by whatever name it goes, it appears that some of the components of the reproduction cost approach were made part of the testimony of respondent's witness. The witness testified to the value of the building, then he added the land value, calculated from market data. That land and improvements can be valued separately is the characteristic assumption of the reproduction cost approach. (See Whitaker, *Real Property Valuation in California,* supra, 2 U.S.F. L.Rev. 47 at p. 54.) The witness did not indicate how he reached the figure of $66,910 for the value of the building and improvements; nor did he testify to the depreciation factor which must be taken into account in using this method. But he did arrive at a final figure made up of the land value, derived from comparable market data, and the value of the building. Such testimony does not constitute a mere arithmetical calculation, as respondent contends. It appears that parts of the reproduction cost method were used merely as a check on the validity of the figures arrived at from other methods.

Section 1272.06 of the Code of Civil Procedure does not authorize the admission of evidence which is inadmissible because of a failure to comply with section 1272.02 of the Code of Civil Procedure. To the contrary, section 1272.06 is applicable only if the court finds that the party sponsoring the evidence has made a good faith effort to comply with sections 1272.01 to 1272.03, and that reasonable diligence has been exercised or there is evidence of mistake, inadvertence, surprise or excusable neglect.

Whatever error may have occurred in this connection cannot be considered prejudicial. The witness had used two other methods to come to the same conclusion. The introduction of the testimony referred to was specifically prefaced by the questioner's statement that it was a "check" on the previous conclusion of the appraiser. The length of the testimony was minimally short, consisting of about a dozen questions in 600 pages of transcript. Since it is a conclusion that is merely cumulative, duplicating conclusions that had already been reached by other methods, it could hardly be maintained that it resulted in any real prejudice to

appellants. (*Long* v. *Cal.-Western States Life Ins. Co.,* 43 Cal.2d 871, 878 [279 P.2d 43].)

The judgment appealed from is therefore affirmed.

Molinari, P. J., and Elkington, J., concurred.