[No. A081531. First Dist., Div. Two. Oct. 27, 1998.]

CITY OF SOUTH SAN FRANCISCO, Plaintiff and Respondent, v. JOSEPHINE ANNE MAYER et al., Defendants and Appellants.

**COUNSEL**

Orrick, Herrington & Sutcliffe and George A. Yuhas for Defendants and Appellants.

David William Skinner for Plaintiff and Respondent.

OPINION

**HAERLE, Acting P. J.—**

### I. INTRODUCTION

This appeal involves the question of whether respondent City of South San Francisco (City) must, in its condemnation action, compensate appellants Josephine Anne Mayer and Estate of Erwin Mayer (appellants) for the value of the City's preexisting leasehold interest in Mayer's property. Like the trial court, we answer this question in the negative and, therefore, affirm the judgment.

### II. FACTUAL AND PROCEDURAL BACKGROUND

The property around which this appeal centers is the South San Francisco Conference Center, located in the City of South San Francisco. Before its development in the late 1980's as a conference center, the property was used as a warehouse facility. In 1989, the City leased the property from its owners, Josephine and Erwin Mayer (the Mayers) for 20 years with options to extend the lease term for 2 ten-year periods. The City paid no rent during the first 18 months of the lease term and constructed a conference facility on the site at a cost of $7.5 million. The City also agreed to pay all expenses relating to the occupancy of the site and, at the end of the lease term, the parties agreed that all improvements would be surrendered to the Mayers.

Of importance for the purpose of this appeal is the lease's condemnation clause. This clause applies in the event "all or any portion of the Property is taken under the power of eminent domain or sold under the threat of that power (all of which are called 'Condemnation') . . . ." The clause then provides that "Any Condemnation award or payment shall be distributed in the following order: (a) first, to any ground lessor, mortgagee or beneficiary under a deed of trust encumbering the Property, the amount of its interest in the Property; (b) second, to Tenant, only the amount of any award specifically designated for loss of or damage to Tenant's trade fixtures or removable personal property; and (c) third, to Landlord, the remainder of such award, whether as compensation for reduction in the value of the leasehold, the taking of the fee, or otherwise."

In January 1997, the City filed a complaint "to condemn the fee simple title in and to the subject property for purposes of maintaining and operating a public convention hall . . . ." Notably, the City did not condemn its own preexisting leasehold interest in the property. The City's expert, therefore,

valued the property at between $4.3 million and $5.15 million, a valuation which excluded any award for the value of the leasehold.[1] Appellants' valuation expert, on the other hand, was prepared to testify at trial that the value of the property was approximately $9.5 million. This valuation included the expert's assessment of the value of the leasehold interest the City had not condemned.

Recognizing that the crucial issue in valuing the property was whether the leasehold interest should be included, the parties filed motions *in limine* on this subject. Appellants sought to have the City's valuation evidence excluded on the ground that it did not properly take into account the value of the leasehold. The City, on the other hand, sought to exclude appellants' expert testimony which, it contended, improperly attempted to include the value of the City's interest in the leasehold.

The trial court denied appellants' motion *in limine* and granted the City's. On December 8, 1997, the court entered a judgment, pursuant to a stipulation between the parties, that just compensation for appellants' interest would be $5,325,000 and would not include the value of the leasehold interest. **(1)**(See fn. 2.)   This timely appeal followed.[2]

---

[1]The City contends that appellants are entitled to compensation for only two of the three "bundle of rights" associated with the property: the present value of the future rent due the Mayers under the lease ($3,902,063) and the value of the reversion ($383,779). Appellants, however, argue that he is also entitled to the value of the leasehold held by the City, the third right in the "bundle of rights" associated with the property.

The value of the leasehold is something separate and apart from the value of the income stream due to the Mayers throughout the term of the lease and is often attributable to the "divergence between market rent and contract rent, or substantial capital improvements by the tenant . . . ." (Goldberg et al., *Bargaining in the Shadow of Eminent Domain: Valuing and Apportioning Condemnation Awards Between Landlord and Tenant* (1987) 34 UCLA L.Rev. 1083, 1090.) This is sometimes referred to as the lease's "bonus value." In this case, the leasehold's bonus value was considerable. The City's expert valued it by subtracting the total of the Mayers' two interests in the property, that is, (1) the present value of the future rent and (2) the value of the reversion, from the value of the "unencumbered fee," i.e., the fair market value of the entire property. The value of the "unencumbered fee" is $9.8 million and the value of the Mayers' two property interests is $4,285,842. Therefore, the City's expert opined that the total value of the leasehold is approximately $5.5 million. It is this amount of money that appellants contend is due to them from the City.

[2]There is some question about whether the parties may appeal from the judgment entered pursuant to this stipulation. The Fourth Appellate District recently considered this issue: "Ordinarily a judgment entered pursuant to a stipulation is not appealable. [Citation.] In *Building Industry Assn. v. City of Camarillo* (1986) 41 Cal.3d 810 [226 Cal.Rptr. 81, 718 P.2d 68] . . . however, the Supreme Court stated, '. . . there is an exception to the rule that a party may not appeal a consent judgment. If consent was merely given to facilitate an appeal following adverse determination of a critical issue, the party will not lose his right to be heard on appeal.' (*Id.,* at p. 817.)" (*Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1428 [77 Cal.Rptr.2d 574] (*Tudor Ranches*).) The court in *Tudor Ranches*

## III. DISCUSSION

### A. *The City Cannot Be Compelled to Condemn Its Leasehold Interest in the Mayers' Property*

The City and appellants both acknowledge that they contractually agreed, in the event the City's leasehold interest in the Mayers' property was condemned, that the Mayers would be entitled to any condemnation award attributable to the loss of the leasehold. Nor is there any disagreement about whether this contractual agreement is enforceable. ██ Although generally a tenant is entitled to all compensation attributable to the tenant's interest in a lease, it is well recognized that the parties to a lease may contractually agree to allocate a condemnation award to the landlord rather than the tenant. (*Dix Box Co.* v. *Stone* (1966) 244 Cal.App.2d 69, 70-76 [52 Cal.Rptr. 847]; *City of Beverly Hills* v. *Albright* (1960) 184 Cal.App.2d 562, 564-570 [7 Cal.Rptr. 706] (*City of Beverly Hills*).)

██ Where the City and appellants part company is over the question of whether the City could condemn the Mayers' interest in the fee title to the property without also condemning the City's leasehold interest. No reported decision addresses this question.

Faced with a paucity of case law in this area, the City instead weaves together a number of general principles governing the exercise of its power of eminent domain. In so doing, it creates a convincing argument that it cannot be required to condemn its leasehold interest in the Mayers' property.

First, the power of eminent domain may only be exercised if the property interest to be acquired is "necessary" for a public use. (Code Civ. Proc.,

---

went on to consider whether this rule was abrogated by *Morehart* v. *County of Santa Barbara* (1994) 7 Cal.4th 725 [29 Cal.Rptr.2d 804, 872 P.2d 143]. In *Morehart*, the Supreme Court held that ". . . an appeal cannot be taken from a judgment that fails to complete the disposition of all the causes of action between the parties even if the causes of action disposed of by the judgment have been ordered to be tried separately, or may be characterized as 'separate and independent' from those remaining." (*Id.* at p. 743.) The *Tudor Ranches* court concluded that *Morehart* would preclude review of a stipulated judgment in which the parties "recited their intent that the remaining claims be dismissed *without prejudice* to their later prosecution." (*Tudor Ranches, supra*, 65 Cal.App.4th at p. 1429.) This Division disapproved of this very practice in *Jackson* v. *Wells Fargo Bank* (1997) 54 Cal.App.4th 240 [62 Cal.Rptr.2d 679]. However, the *Tudor Ranches* court concluded that *Morehart* does not "preclude[] a party from stipulating to an adverse judgment *with prejudice* on *all* of its claims, in order to appeal from that judgment." (*Tudor Ranches, supra*, 65 Cal.App.4th at p. 1429.) The judgment and stipulation in this case are of this nature and, therefore, the judgment is appealable.

§ 1240.110, subd. (a).) Because the City has already acquired the leasehold interest in the Mayers' property, this interest is not a "necessary" one which it may acquire through eminent domain.

The City characterizes appellants' attempt to recover the value of the leasehold interest as an effort to force the City to acquire what it has already paid for. The City argues that this effort is expressly condemned in *State of California* v. *Whitlow* (1966) 243 Cal.App.2d 490 [52 Cal.Rptr. 336] (*Whitlow*). In *Whitlow*, the State of California condemned 82 acres of lands owned by defendant Whitlow. Because the state already leased almost 38 acres of this land, the state's expert did not include in the condemnation award any amount to compensate the landowner for the value of the state's leasehold interest. Whitlow attempted to argue that the condemnation award should include the value of the lands leased by the state. In rejecting this argument, the court opined that Whitlow's argument "ignores equity because it requires the condemnor to pay twice for the leasehold interest. In other words, it requires the state to buy again that which it has already bought *and paid for*." (*Id.* at p. 494.) The City convincingly argues that *Whitlow* bars appellants from trying to force the City to pay them for the value of the leasehold interest, an interest which the City correctly points out it has already paid for.

The City also points out that there is nothing which prohibits a public agency from exercising its power of eminent domain to acquire some but not all of the interests in a piece of property. In fact, the City points to a recent case from this Division which makes clear that ". . . a condemnor cannot be required to take more severable rights in property than what it needs for the public use." (*Contra Costa Water Dist.* v. *Vaquero Farms, Inc.* (1997) 58 Cal.App.4th 883, 893 [68 Cal.Rptr.2d 272].)

Finally, relying on *City of Glendale* v. *Superior Court* (1993) 18 Cal.App.4th 1768 [23 Cal.Rptr.2d 305] (*City of Glendale*), the City contends that it cannot be compelled, as Mayer argues, to condemn the leasehold simply because it agreed to allocate to Mayer any award attributable to such a condemnation. In *City of Glendale*, the city leased some property to a corporation for a 20-year term. The city reserved the right to unilaterally terminate the lease after 10 years if the property was needed for a "municipal purpose." (*Id.* at p. 1777.) Five years after the lease was executed, the city condemned the leasehold. The tenant argued that the lease contained an implicit promise by the city not to exercise its eminent domain power until after the expiration of the 10-year period. The court disagreed, relying on the general rule that ". . . governmental powers over land use are not subject to abridgment by contract." (*Id.* at p. 1779.) The court concluded, therefore, that the lease "did not contractually restrict the City's authority to condemn

[tenant's] leasehold interest. Put another way, the City had no contractual obligation to refrain from exercising its power of eminent domain." (*Id.* at p. 1780.) It is equally true that the City cannot enter into an enforceable agreement to *exercise* its power of eminent domain in any particular way. Therefore, to the extent that appellants are arguing that the condemnation clause in their lease with the City contained an implied promise that the City would condemn its own leasehold interest along with the Mayers' fee interest, this argument is refuted by *City of Glendale*.

In our view, these three strands of eminent domain law, i.e., (1) the requirement that property be condemned only for a "necessary" public purpose, (2) the general notion that a public agency cannot be required to either purchase an interest it already owns or purchase more property than is "necessary," and (3) the prohibition against reading a contract as containing any obligation on the part of a public agency to exercise its power of eminent domain in any particular way, combine to make a compelling case in support of the City's position.

## B.  *Appellants Have Failed to Establish That They Are Entitled to Compensation for the Value of the Leasehold*

Appellants, also faced with the lack of any precedential guidance, raise three arguments in support of their position, none of which, when examined closely, is tenable.

### 1.  *City of Glendale v. Superior Court Does Not Mandate That the City Compensate Appellants for the Value of the Leasehold*

Appellants argue that *City of Glendale* stands for the proposition that "the public agency must taken into account its own contractual obligations" when it exercises its power of eminent domain. Although appellants do not say this explicitly, we infer that, by the phrase "must take into account," Mayer is suggesting that the City has a contractual obligation to compensate them for the leasehold interest because the City entered into a lease which allocated the proceeds from any condemnation award of the leasehold interest to the Mayers. This argument works, however, only if appellants can show that the City in fact has a contractual obligation to condemn its leasehold interest at the same time as it condemns the Mayers' fee. *City of Glendale*, however, stands for the opposite point: a city *cannot* enter into an enforceable agreement to exercise its power of eminent domain in any particular way.

What *City of Glendale* does stand for is the unexceptional proposition that advantageous lease terms, such as the length of the lease and provisions for

termination and relocation benefits, must be taken into account when valuing a leasehold interest. In *City of Glendale*, for example, although the city was entitled to cut short the lease term through the exercise of its eminent domain power, the valuation of the lease had to take into account the fact that "the lease entitled [the lessee] to stay in this location for another six years after the filing of the City's complaint and the payment of the estimated value. This right was lost as were whatever termination and relocation benefits are provided for under the lease. In short, the valuation of the leasehold must take into account the special provisions which [the lessee] negotiated in order to protect itself from premature loss of the leasehold interest." (*City of Glendale, supra,* 18 Cal.App.4th at pp. 1780-1781.) This does not mean, however, that the City must purchase its own leasehold interest because the lease contains a clause allocating the proceeds of any condemnation award to the landlord. We know of no general principle of either eminent domain or contract law, and Mayer has cited none, which would force a party who has conditionally conceded an advantageous term in a contract, to trigger that term simply because the ability to do so is in that party's sole power.

2. *People* ex rel. *Dept. Pub. Wks. v. Lynbar, Inc., Similarly Does Not Mandate That the City Compensate Appellants for the Value of the Leasehold*

Appellants also contend that *People* ex rel. *Dept. Pub. Wks.* v. *Lynbar, Inc.* (1967) 253 Cal.App.2d 870 [62 Cal.Rptr. 320] (*Lynbar*) advances their argument. We do not agree.

In *Lynbar*, the state condemned for freeway purposes land on which a gas station was located. The property owner, Lynbar, leased the property to Tidewater, which operated a gas station at the site. The state attempted to argue that the value of the property should not take into account the value of the lease to Lynbar. This lease had some value because it had a "relatively long unexpired term and a comparatively high rental . . . ." (*Lynbar, supra,* 253 Cal.App.2d at p. 876.)

The Court of Appeal rejected this argument, articulating the well-established principle that the valuation of property subject to a lease must take into account any value attributable to the lease: "In this state, as is generally true elsewhere, the constitutional requirement of just compensation for the taking of property in eminent domain is normally satisfied by the payment by the condemnor to the condemnee of the market value of the property taken. [Citation.] This market value is the highest price which the property would bring, if exposed for sale in the open market by a willing seller to a

willing buyer with both parties to the transaction being fully informed of all the uses and purposes to which the property is reasonably adaptable and available. [Citations.] Subject to certain limitations which are not here relevant, to arrive at this value one must take into consideration all those things upon which such parties, dealing with each other in the open market, would reasonably rely. [Citation.] For this purpose the property, together with all of its compensable attributes, must be valued as the condemnor finds it, including without limitation thereby, the state of its title, and in this case, the Tidewater leasehold. [Citations.] We say this because this very valuable leasehold is one of the things which such a buyer and seller would consider in the open market in fixing the price at which the ownership of the property would be transferred. To say that the existence of such a lease should be ignored by resorting to the legal fiction and legal pretense of a single owner is to ignore the realities of the market place. If compensation is to be just and if the property owner is to be made whole for the involuntary loss of his property to the state, this cannot be permitted to happen." (*Lynbar, supra,* 253 Cal.App.2d at pp. 880-882, fns. omitted; see also *County of Los Angeles* v. *American Sav. & Loan Assn.* (1972) 26 Cal.App.3d 7, 9-11 [102 Cal.Rptr. 439] [describing valuation of property encumbered by leases].)

The *Lynbar* court thus articulated the general principle that when valuing property which is being condemned in its entirety, an expert must take into account the existence of a favorable lease. It does not, however, as appellants argue, "recognize[] that a valuation approach that is ordinarily acceptable may be legally inappropriate where its application would deprive the condemnee of important benefits under an existing lease." First, *Lynbar* did not involve a "valuation approach that is ordinarily acceptable"—the state's suggested valuation approach was patently unacceptable, because it attempted to exclude any reference to the existence of a favorable lease. Second, the "important benefits" under the City-Mayer lease to which appellants refers are not actually "benefits" at all, but a conditional term that was never made applicable because the City did not condemn the leasehold interest.

3. *The City's Valuation of the Mayers' Interest Does Not Lead to "Unfair and Anomalous" Results*

Appellants finally argue that, if the City is permitted to value Mayer's interest without taking into account the value of the leasehold, "unfair and anomalous results" would obtain. None of the scenarios raised by appellants however, persuades us that the outcome of this case creates a rule that could lead to such unfair or anomalous results.

First, appellants argue that the City could render a landlord-favorable condemnation clause in a lease inoperable in the event of *any* condemnation

action and, in so doing, keep for itself the value of the leasehold interest. Appellants propose a scenario in which the City might, upon learning of condemnation proceedings contemplated by another public agency such as the State of California, choose to first condemn the Mayers' interest in the property for $5 million and then receive from the state the entire amount of the property's fair market value of $10 million, including the value of the leasehold interest which would, under the condemnation clause, ordinarily go to the landlord. However, given the basic requirement that the power of eminent domain be exercised only for a "necessary" public use, we doubt that the City would attempt or be permitted to use its power of eminent domain in this fashion.

The other scenario painted by appellants is also, upon closer examination, chimerical. Appellants argues that the outcome of this case results in a rule that would "allow a public entity to ignore condemnation clauses." Appellants speculate that a public agency that wished to condemn property encumbered by a lease containing a landlord-favorable condemnation clause could evade paying the value of the leasehold interest to the landlord. The public agency could do so by purchasing from the tenant the leasehold interest for a "nominal amount." The tenant's motivation for agreeing to such an arrangement would presumably be that because the tenant would be entitled to no compensation upon condemnation, the tenant would, when faced with a proposed condemnation action, prefer to receive at least something from the public agency. The public agency would then be in possession of the leasehold and could condemn the underlying fee without paying the landlord for the value of the leasehold.

A rule which would force a public agency to acquire its own leasehold interest whenever it sought to condemn property encumbered by a lease with a landlord-favorable condemnation clause would be unnecessary to prevent the sort of activity appellants describe. A landlord concerned with the possibility that a tenant might assign its interest to a potential condemnor would be likely to bargain for restrictions on assignment and subletting that would permit the landlord to exercise some control over the tenant's disposition of its leasehold interest. (See, e.g., 2 Miller & Starr, Cal. Real Estate Forms (1992) Leases, § 2:8, p. 224 ["The assignment and subletting provision is one of the most important sections in the lease. This section protects the landlord's right to an economic benefit from the lease and assures control over the identity of all tenants. Therefore, landlords commonly impose strict limits on assignment and subletting."].)

Perhaps more importantly, a public agency's collusion with a party to a lease in order to avoid paying compensation to another party to a lease

would nevertheless be considered a taking and could not, therefore, be used to circumvent payment of just compensation. For example, in *U.S.* v. *12.18 Acres of Land in Jefferson County, Kan.* (10th Cir. 1980) 623 F.2d 131, the federal government planned to condemn a railroad right-of-way. The right-of-way was owned by the Atchison, Topeka and Santa Fe Railway Company. At the time of the planned condemnation, the railroad leased segments of the right-of-way to lessees who had built buildings and other improvements on the right-of-way. The railroad entered into a contract with the government in which the railroad agreed to terminate these leases prior to the condemnation of the property. In so doing, the railroad and the government prevented the lessees from receiving compensation for the value of their improvements on the right-of-way.

The court held that a taking had, nevertheless, occurred and ordered that the lessees be compensated. The court explained, ". . . the railroad and the Government had handled the removal of the right-of-way to a new location in a manner whereby the need to compensate the intervenors was sought to be avoided. [¶] The railroad-Government agreement was entered into at a time when the leases of intervenors [lessees] were in good standing. The agreement required, in substance, that the leases be terminated in contemplation of the move of the right-of-way. At the time the agreement was executed it is apparent that the Government was committed to the project and its scope had been defined. It was likewise apparent that the leaseholds in question would be part of the area which would ultimately have to be condemned. The Government, in substance, had the railroad remove the lessees rather than to condemn. [¶] The period of time involved is long, but the method was apparent." (*U.S.* v. *12.18 Acres of Land in Jefferson County, Kan.*, *supra*, 623 F.2d at pp. 132-133.)

Appellants' scenario involves a similar situation in which a public agency, contemplating a condemnation action, enters into an agreement with one party to a lease in order to avoid condemning the interest of another party to a lease. Because a taking would nevertheless occur, such a strategy could not be used to deprive a party of just compensation for a taking. Here, of course, no such collusive effort took place. The City entered into possession of its leasehold interest through an arm's length agreement with the Mayers themselves. The City constructed improvements on the property and agreed to pay the Mayers rent for an extended period of time. The benefits of this arrangement for both sides are apparent: the Mayers agreed to rent the premises at a favorable rate to the City in exchange for the City's agreement to a long-term lease as well as for the substantial improvements it made to the property, improvements which would revert to the Mayers at the end of

the lease term. The City compensated them both for the present value of the right to receive rents over the lease term as well as for the value of the reversion. There is no indication that the City entered into this lease with them with any intention to evade paying them due compensation in the event of condemnation.

Finally, Mayer asserts that "[i]t would be anomalous to allow a public agency to use condemnation clauses when it acts as condemnor/owner but ignore such provisions when it acts as condemnor/lessee." We are wholly unpersuaded that the cases appellants cite support this "tit for tat" argument.

In *New Haven Unified School Dist.* v. *Taco Bell Corp.* (1994) 24 Cal.App.4th 1473, 1477 [30 Cal.Rptr.2d 469] (*New Haven Unified*), the school district sought to condemn property encumbered by a below-market rent lease. The parties' disagreement had to do with whether the lease's condemnation language gave the landlord or the tenant the right to compensation for the leasehold. We are mystified, however, by appellants characterization of this case as one in which a public agency "reaps the benefit" of a condemnation clause. The school district in this case was required to pay the value of the leasehold interest; the only question was to whom. This case does not involve any "benefit" to the school district because of an owner-favorable condemnation clause.

Nor does *City of Beverly Hills, supra,* 184 Cal.App.2d 562 involve such a situation. There, as in *New Haven Unified,* the public agency owned no interest in the property being condemned. In *City of Beverly Hills,* the city wished to condemn for off-street parking commercial property that was encumbered by a lease. (*Id.* at p. 563.) The principal issue in that case involved whether the tenant was entitled to any compensation for improvements made to the premises. The lease provided that at the termination of the lease, all improvements would belong to the lessor and all removable trade fixtures could be retained by the lessee. (*Id.* at p. 564.) Again, however, this case concerned the proper apportionment of the condemnation award, not whether the amount of the condemnation award could be reduced because of an owner-favorable condemnation clause. We perceive no "benefit" to the City because of this clause.

In sum, none of appellants' parade of horribles convince us that the City should be required to compensate appellants for the value of the leasehold interest. Accordingly, we conclude that the trial court did not err in granting the City's motion *in limine* to exclude evidence of the value of this interest.

## IV. Disposition

We affirm the judgment.

Lambden, J., and Ruvolo, J., concurred.