**HAPPY INVESTMENT GROUP, a joint venture, et al., Plaintiffs,**

**v.**

**LAKEWORLD PROPERTIES, INC., a corporation, et al., Defendants.**

**No. C-73-0280-OJC.**

United States District Court,
N. D. California.

April 9, 1975.

Order Reinstating Action May 19, 1975.

John F. Wells, Alfred N. Gertmenian, George F. Dunker, Stark, Stewart, Si-

mon & Sparrowe, Oakland, Cal., John F. Banker, San Francisco, Cal., Harold A. Berliner, Nevada City, Cal., for plaintiffs.

Max Thelen, Jr., Paul R. Haerle, Robert B. Pringle, John D. Carter, Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., Stephen M. Chandler, Chandler, Bruner & Blunden, San Leandro, Cal., Kurt W. Melchior, D. Ronald Ryland, Severson, Werson, Berke & Melchior, San Francisco, Cal., Fred K. Howell, Jr., Berkeley, Cal., for defendants.

### MEMORANDUM AND ORDER

OLIVER J. CARTER, Chief Judge.

This case is before the Court on defendants' motion to dismiss, or in the alternative, for summary judgment. The action was brought by a group of plaintiffs who purchased lots in two recreational subdivisions (Alta Sierra Estates and Prosser Lakeview Estates) owned, developed and sold by defendants. Plaintiffs have alleged claims under the Securities Exchange Act of 1934 and under the Interstate Land Sales Full Disclosure Act of 1968, in addition to pendent claims and a claim for declaratory relief.

Defendants have made a series of motions: first, that this Court lacks jurisdiction under the Securities Exchange Act because, as a matter of law, the lots are not securities; second, that the Court lacks jurisdiction under the Interstate Land Sales Act because the subdivisions are exempt from regulation; third, that, even if there is jurisdiction under the Interstate Land Sales Act, no cause of action has been stated. Additionally, defendants have moved to dismiss plaintiffs' claim for punitive damages and have alleged that plaintiffs' claims under the Interstate Land Sales Act are barred by the statute of limitations.

### Did Plaintiffs Buy Securities?

The first, and perhaps the most crucial, issue in this case is whether plaintiffs have a claim under the Securities Exchange Act of 1934. Are lots in a recreational subdivision federal securities?

■ Plaintiffs claim that they entered into investment contracts with defendants when they purchased lots in Alta Sierra and Prosser Lakeview. In the field of investment contracts, we are primarily governed by two Supreme Court cases: SEC v. Joiner Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943) and SEC v. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1945). Together, these two cases set forth the basic proposition that an investment contract exists when purchasers were led to invest money in a common enterprise with the expectation that they would collect profits solely through the efforts of others. SEC v. Howey, *supra* at 298, 66 S.Ct. 1100. In *Howey*, for example, plaintiffs had invested in orange groves in Florida. Defendants cultivated and serviced the orange groves, giving a share of the profits to plaintiffs. The buyers were non-residents and depended entirely on defendants for the cultivation and harvesting of the oranges.

The word "solely" has been somewhat diluted in this Circuit by the Court of Appeals' decision in SEC v. Glenn Turner Ent., Inc., 474 F.2d 476 (9th Cir. 1973). In that case, the Ninth Circuit held that the word "solely" must be realistically defined; the investor should not be thrown out of court because he has made a "modicum of effort".

> "Rather we adopt a more realistic test, whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Glenn Turner, supra,* at 482.

This Court, in its analysis, will bear in mind the Ninth Circuit's interpretation of the *Howey-Joiner* rule.

■ With this basic underlying framework in mind, the Court turns to

the facts of the instant case. First, the Court notes that there appears to be no real factual dispute among the parties; therefore this motion is appropriate for decision under F.R.Civ.P. 56.[1] The Court's attention focuses upon the proposition that defendants made the "essential managerial efforts" which affected the success of Alta Sierra and Prosser Lakeview.

Defendants did undertake to, and apparently have completed, the installation of roads and utilities in the subdivisions. These improvements were separately bonded. In 1970–71 defendants developed a resale program at Alta Sierra to help purchasers re-sell their lots; this program was instituted after all plaintiffs in this action had bought their lots.[2]

Plaintiffs at Alta Sierra received the *Alta Sierra Sentinel,* a news bulletin which contained glowing reports of home building, community activities, and of the general progress of the subdivision. There was, according to various handouts prepared by Lakeworld, an Architectural Control Committee, formed to "protect the investment of property owners in Alta Sierra." (Plaintiffs' Exhibit E–1, page 2). Apparently the Committee's purpose was review of proposed house plans to see that the plans met the Alta Sierra standard. How active this Committee actually was is unclear to the Court from the materials supplied by the parties.

Other literature indicated that "Commercial and Multiple Areas" were being planned and would "be designated" in the near future. (Plaintiffs' Exhibit E-1, page 3). Again, whether anything came of this general assertion is unknown to the Court.

The items enumerated above appear to reflect the total commitment that defendants had made to the subdivisions. Defendants had no service or managerial contracts of any nature with any plaintiff.

Once a purchaser had signed a bill of sale for a lot in either subdivision, he had full title to it; defendants retained no legal interest, beyond taking a deed of trust to secure repayment.

On the face of this series of facts, the Court preliminarily concludes that defendants did not have "essential managerial" control over the lots once they passed from defendants to plaintiffs. Plaintiffs argue, however, that the lots cannot be viewed separately, but must be viewed as part of a whole. Plaintiffs were told that they were being offered a chance to share in a "viable recreational community." (Plaintiffs' Exhibit F-3). Defendants' literature informed readers that defendants were experts and leaders in the field of recreational-resort planning (Exhibit F-1), that the subdivisions had been carefully researched and planned to insure quality and integrity (Exhibit E-2, page 30). It was also emphasized by Lakeworld salespersons that land *per se* was an excellent investment and that land values were sure to go up.[3] (Exhibits (A-21, S).

Plaintiffs argue that because they relied upon defendants' efforts as experts in the resort land business to create a

---

1. Plaintiffs' counsel Robert Lane, by a Rule 56(f) affidavit, states that plaintiffs were unable to get discovery on facts occurring prior to February 5, 1970. Plaintiffs' counsel believes this discovery would be relevant to the securities question. However, the Court believes that, even though a number of the plaintiffs bought their land in mid-1969, the total picture as presented here would not change substantially given additional discovery, particularly as it relates to the crucial question as to whether defendants engaged in ongoing activities affecting plaintiffs' land concurrent with plaintiffs' ownership.

2. The Court notes that, in any case, this resale program was not something that defendants used as a selling point to *sell* lots; rather, it was an attempt to stop individual owners from putting up "sale by owner" signs and an attempt to cut down on the number of repossessions by defendants.

3. After 1971, salespersons were instructed not to say anything regarding making money on land, or that land was a good investment. (Exhibit F–3, page 1).

"viable" and successful recreational subdivision, a simple land sale was turned into an investment contract and a security. The Court finds, for the reasons below, that it must reject plaintiffs' argument, for the facts of the case do not support the contention that the sale of the lots in Alta Sierra and Prosser Lakeview represented an investment contract.

First, the situation presented here is unlike other investment contract cases in that plaintiffs will not realize any actual profits on their investment until their lots are sold. In *Howey*, for example, plaintiffs received annual profits from the harvest and sale of oranges while holding ownership of shares in orange groves. In 1050 Tenants Corp. v. Jakobson, 503 F.2d 1375 (2d Cir. 1974), ownership of shares in a cooperative housing corporation resulted in reduced monthly rates as a result of income from professional offices in the building, as well as yearly tax benefits. In Huberman v. Denny's Restaurants, Inc., 337 F.Supp. 1249 (N.D.Cal.1972) plaintiff, who bought property already under lease received rent plus 5% of the gross sales as owner of the property. The value of the land in this case may indeed increase while plaintiffs hold it, but at no time *until sale* of the land will plaintiffs realize any actual monetary profit.

■ The value of plaintiffs' land may increase, but that alone is not enough to make the land a security; the land must be developed or operated by others. Loss, Securities Regulation, 492. Buying land with expectations of profit does not make the transaction a security. Contract Buyers League v. F & F Investment, 300 F.Supp. 210 (N.D.Ill. 1969); Huberman v. Denny's Restaurants, Inc., *supra.*

Plaintiffs in this action urge, however, that they relied upon defendants' efforts to *develop* their land into a successful subdivision. It is certainly the case that defendants, through their literature and sales talks, seem to have given the impression that they would contribute substantial efforts to create a thriving subdivision, but *in fact* they offered no concrete programs, presented no substantive plans to further this goal. The defendants, in retrospect, were masters of generalizations. For example, although defendants claimed they were "placing emphasis upon home construction" (Plaintiffs' Exhibit A-2) and were going to "work closely with appropriate Northern California homebuilders" (*Id.*) they actually offered no help insofar as individual home construction went, except to supply a list of names of local contractors with approximate bidding prices. (Plaintiffs' Exhibit E-1, p. 2). Again, although plaintiffs were told that commercial areas were being planned and would "be designated" in the near future, nothing was said about defendants' participating in efforts to draw commerce or commercial enterprises to the area.

In Los Angeles Trust Deed and Mortgage Exch. v. SEC, 285 F.2d 162 (9th Cir. 1960) defendants, who sold individual trust deed notes to plaintiffs under a program called the "Secured 10% Earnings Program," advertised that plaintiffs could rely on the skill of defendants' officers to protect their investment:

"(V)ery few persons . . . could read the advertising of the appellants without coming to the firm conclusion that by sending moneys to the appellants they would receive far more than a note . . ." *Id.* at 168.

The court in *Los Angeles Trust Deed* found that defendants actually *did* perform necessary and skilled services connected with the notes, and that because of defendants' *actions* in this regard, the notes became securities.

■ In the instant case, although the literature and sales pitch by defendants might lead plaintiffs to believe that defendants would give them more than land, *in fact* defendants never offered specialized or particularized skills to plaintiffs and did not perform any skilled activities for plaintiffs after the land

changed hands. The *Howey-Joiner* test, even as modified by *Glenn Turner,* requires that essential managerial efforts be made or offered by defendants. The test is not fulfilled when there are promises of the general nature made by defendants in their literature and handouts, but no actual commitments to perform specific services that affect plaintiffs' control and management of the land.

Plaintiffs have tried to stress the passive nature of their investment; they have argued that the community could only come to fruition through the efforts of its promoter, Lakeworld. However, as plaintiffs admit, "(u)nless houses were built upon all those vacant lots, and people were attracted there to live, the projects would inevitably stagnate . . . ." (Plaintiffs' Brief, 14). In order for the community to develop, individual landowners had to build homes. House building cannot be considered a "passive" activity, requiring only a "modicum of effort," as required by the *Glenn Turner* test. Cf. Chapman v. Rudd Paint and Varnish Co., 409 F.2d 635 (9th Cir. 1966).

The Court must conclude that, although defendants may have created the *illusion* that the subdivision would develop primarily through their managerial efforts, in fact defendants offered to do and did nothing more than sell plaintiffs a parcel of land.

## CLAIMS UNDER INTERSTATE LAND SALES DISCLOSURE ACT

### A. *Jurisdiction*

Counts Two and Three of plaintiffs' complaint assert claims under the Interstate Land Sales Full Disclosure Act (15 U.S.C. § 1701 et seq.). Defendants contend that they have been, or should be, exempted from complying with the Act because the offerings made by defendants were almost entirely intrastate, and

that, consequently, this Court has no jurisdiction.

Defendants did register under the Act with the Office of Interstate Land Sales Regulation (OILSR) in 1970. At the time they filed papers, no exemption was claimed by defendants (Plaintiffs' Exhibit I). Under 15 U.S.C. § 1702(b) the Secretary of Housing and Urban Development may "exempt from any of the provisions of this chapter any subdivision" if the Secretary believes that enforcement is not necessary to protect the public interest.

In 1970, when defendants registered with OILSR, various regulations had been promulgated by HUD. § 1710.-10 in 24 C.F.R. (1970), a subpart of "Part 1710—Land Registration," lists as an "Exemption" the sale of lots where the offering is "entirely or almost entirely intrastate" (§ 1710.10(1)). Defendants contend that their subdivisions fell within this exemption, and that the exemption extends to the anti-fraud sections of the Act as well as to the registration requirements.

Whether or not defendants' subdivision offerings were almost entirely intrastate is a very close question. The rather sparse facts that the Court now has before it indicate that *sales* to nonresidents amount to 3% of the Alta Sierra purchasers and 1.5% of Prosser Lakeview purchasers (Affidavits of Donald Stinson and John Cain). The extent of the *offering* [4] is more uncertain, although advertisements for the subdivisions unquestionably reached nonresidents.

According to defendants (Ragan Affidavit), advertisements were placed in an October 1969 edition of *Sunset* which reached Nevada and Utah, and an October 1969 edition of *Life,* area reached unknown because of destroyed records. According to plaintiffs, the *Sunset* ad would have been exposed to approximately 46,000 persons in Utah and Nevada,

---

4. An offering, according to the Act, is an "inducement or solicitation" to purchase a subdivision lot. 15 U.S.C. § 1701(10).

and the *Life* magazine ad would have been exposed to a minimum 38,187 persons in Nevada and overseas (Lane Affidavit). Defendants state that they intended to, and tried to, advertise in the "smallest geographical edition available to advertisers in California." (Ragan Affidavit).[4a]

The evidence at this juncture indicates that defendants did make offerings to out of state residents, although it was relatively modest. Additionally, although defendants downplay its significance, defendants did authorize an ad to be placed in a German publication. (Exhibit C-1).

The parties make lengthy arguments based on the legislative history of the Act as to the meaning and extent of "almost entirely intrastate." The legislative discussion can be read either way; the only helpful guideline the Court has found is the House Report on the Act in 1968 U.S. Code Congressional and Administrative News at 3067. The Report indicates that the conferees agreed that an example of the "almost entirely intrastate" exemption "would be where a few out-of-state purchasers buy lots only being offered for sale within the State of the land's location or nearby communities." In the instant case, the land was being offered in states other than California, whether or not defendants' primary efforts were in fact directed at California residents. The Court believes, in view of the fact that at least 75,000 non-residents saw an advertisement for one of the subdivisions, that it should not grant the defendants' motion for summary judgment on this issue.

Additionally, the Court believes it should deny the motion for another reason. The Court is not certain whether it in fact has any *power* to grant an exemption where none has heretofore been given by the Secretary. According to the statute, it is within the Secretary's discretion to exempt subdivisions when he (or she) believes it conforms with the public interest. In this instance, since defendants claimed no exemption, the Secretary has had no chance to make any determination of the applicability of the exemption to Alta Sierra and Prosser Lakeview.[5]

Because the Court has determined that the defendants have not qualified for the exemption as of this time, it need not examine defendants' arguments that the exemption extends to the entire Act.

The Secretary of HUD has lodged an amicus brief with this Court, in large part dealing with the issues discussed immediately above. Defendants have objected to its filing on the grounds of extreme lateness. They also ask that, if it is accepted, they be allowed to respond.

The Court agrees that the brief was lodged late in the day; however, this Act and the provisions and regulations thereunder are far from clear in this area since as yet there are few cases dealing with the Act, and any clarification the Court can receive from the administrator of the Act is helpful. Although defendants asked for time to respond, in their opposition to the filing of the brief they have in fact met most of the issues posed by the Secretary. The Court believes no further briefing is necessary as it fully understands the arguments before it. Therefore, the Court will order the brief filed and deny defendants' motion to respond.

### B. *False Registration*

In Count Three of their complaint plaintiffs have alleged that defendants

---

4a. Since plaintiffs were not allowed discovery prior to February 5, 1970, it may be that there is further information obtainable for 1969 which is not yet before the Court.

5. Defendants argue that the exemption in the 1970 regulations is a "blanket" exemption, apparently classifying it as a sort of automatic exemption. The Court is not aware of the exact procedure followed in 1970 by the Secretary, but surely the Secretary has the discretion to examine individual cases to see if the blanket exemption was properly invoked. In the instant case, even that examination could not have been made.

failed to disclose certain information in their Combined Notice of Intention, Questionnaire and Application for Public Report for Standard Subdivision filed with the California Department of Real Estate (DRE). Papers filed with the California DRE are accepted by OILSR as the Statement of Record required by the Interstate Land Sales Full Disclosure Act. 24 CFR 1710.25(c). The basis of plaintiffs' allegations in their complaint (and as confirmed in their reply brief) is that defendants failed to disclose that the land was being offered primarily for investment and resale. Defendants contend that, even if the land was being offered for investment and resale, no such disclosure was required under California law, and therefore plaintiffs have no cause of action under Count Three. This question is appropriate for decision under F.R.C.P. 12(b).

The arguments boil down to 1) an interpretation of 1963 legislation resulting in the enactment of California Business and Professions Code §§ 11010(g) and 11018(f) (hereinafter referred to simply by section number), 2) a few California cases which touch upon definitions of the word "use", and 3) progressive changes in the forms and regulations promulgated by DRE.

■■■ The Court is forced to conclude that the DRE form as it existed in 1969 when defendants filed did not require that defendants indicate the land was for investment and resale. Again, as with the first two issues discussed above, the question is close, and again, the Court has no real precedent to guide it.[6]

Section 11010(g) states that the owner or subdivider must make to the Commissioner of Real Estate

"A true statement of the use or uses for which the proposed subdivision will be offered".

Section 11018(f) states that the Commissioner may refuse to issue a Public Report if there is a

"Failure to make a showing that the parcels can be used for the purpose for which they are offered".

Both of these sections are the result of legislation passed in 1963. The background to this legislation is important for the arguments in this case. The Assembly Interim Committee on Governmental Efficiency and Economy, after extensive hearings, issued a Report in 1963 in which it recommended that land should be recognized and treated as a security. Assem.J.App., Vol. 8, No. 7, page 25 (hereinafter Report), (Exhibit M-6). The Report also recommended that the public report given to prospective purchasers should be revised and made more readable. As a result of the Report, Assembly Bill 336 was drafted. Originally, § 11018 provided that the Commissioner could refuse to issue a public report if the proposed sale was not fair, just and equitable. That section was rejected as proposed, and instead various specific criteria were substituted, among them 11018(f).

In 1969, when defendants filed their Combined Notice of Intention, Application and Questionnaire with DRE, they filled out Form 628 (Rev. 2–4–69). On that form, question 6 is the critical question at issue:

"6. Uses. For what use, or uses, will property be offered: single family residential; residential income; commercial; industrial; recreational; agriculture; if other, please describe." (Exhibit 8 to Chenoy Affidavit).

---

6. The parties have referred the Court to several pending state actions in which the same question is at issue. These cases are of no practical help to the Court since no opinions have been announced. The plaintiffs have additionally asked that the Court take judicial notice of the *Amicus* brief filed by the California Attorney General in Coordination Proceedings, Judicial Council No. 004, Superior Court of Alameda County; defendants object to such notice. The Court takes judicial notice of the fact of the Attorney General's brief, since it is a matter of public record; its contents are subject to scrutiny and analysis by this Court.

Defendants contend that the word "use" in this question refers only to utilitarian or physical use of the property. "Investment," they contend, connotes a purpose, and therefore is not an appropriate response to question 6. Plaintiffs argue that "use" as used in this question does encompass investment and resale.

In 1971, DRE promulgated some additional regulations in regard to the advertising and marketing of subdivisions. Cal. Administrative Code § 2819.55 (repealed in 1973) stated that the use of any advertisement which contained any projection as to profit appreciation in dollar value or resale potential may be held to be misleading by the Commissioner. § 2810.35 requires copies of all advertisements to be used in connection with the offering to be submitted as part of the documentation prior to issuance of the public report. (Defendants by affidavit allege that they have complied with this latter section since 1971: Affidavits of Crotty and Paggi).

In 1973, a new Combined Notice of Intention, Questionnaire and Application form was devised by DRE. (Exhibit to Howell Affidavit). Changes which defendants allege are in part determinative of the instant issue took place. Question 6, originally entitled "Uses", was changed to read "Uses-Zoning"; subparts were added to that question dealing with zoning, all aspects of the land's *physical* use.

A new section under the "Sales Program" Section (questions 26–28) was added; it required the subdivider to

"indicate which of the following inducements or representations will be made in the advertising and marketing . . . (a) investment merit or appreciation potential of lots, parcels, or units . . ." (Question 27a).

These changes, combined with the 1971 Administrative Code sections, form the core of defendants' argument that the 1969 form did not require defendants to disclose that the land's principal use

was for investment and resale. The Court agrees. The changes and additions indicate that the Commissioner believed the form, as it existed in its 1969 format, was insufficient to elicit the information at issue here: whether or not land is being offered for investment purposes. The increased emphasis in 1971 on regulation of advertising and marketing of subdivisions, and, in addition, the questions in the 1973 form which ask specifically for representations regarding the investment potential of land, indicate to the Court that the Commissioner was of the opinion that the previous form did not require this information as a matter of course.

Plaintiffs employ several arguments to support their contention that "use" in question 6 meant "investment". First, they rely on two California cases: State of California v. Whitlow, 243 Cal. App.2d 490, 52 Cal.Rptr. 336 (1966) and Cowell v. Clark, 37 Cal.App.2d 255 99 P.2d 594 (1940). In *Whitlow*, a condemnation case, the court did hold that, as applicable to "modern concepts of land valuation *in terms of 'market value'*", (emphasis added) the speculative use of land was a proper element to be considered in appraising the land. State of California v. Whitlow, *supra*, at 499, 52 Cal.Rptr. at 342. The instant case is not a condemnation case; it does not raise the question of market value. The court's definition of "use" in *Whitlow* cannot be determinative of the meaning of the word in the present context.

The *Cowell* case, cited for the proposition that all potential aspects of a land's function must be revealed by the subdivider, was a different sort of case from *Whitlow*. There the court stated that, where the plaintiff was seeking to assign a lease of lands for oil purposes, he should show the facts which indicate the lands are oil bearing. This case does not hold, insofar as the 1969 Combined Notice of Intention Form is concerned, that the term "use" encompasses investment, nor does it stand for the general proposition that all potential uses or

functions of subdivided land *must* be detailed by defendants when filing with DRE.

Plaintiffs' next argument centers on the legislative history of § 11010(g) and § 11018(f) referred to above. The legislation, according to the Assembly Interim Committee's Report, *supra*, was directed primarily at

> "remote, unanchored, undeveloped and usually submarginal land and the sale of these parcels on installment contracts, sight unseen, to small income citizens for residential, retirement, and investment (sic). To the purchaser the problem is one of securing clear title to the land and improvements he has been told he is buying." Report, *supra*, page 25.

Neither Alta Sierra nor Prosser Lakeview fit that description. The lots are not remote; they are easily accessible by road and are within reach of centers of civilization. They are not underdeveloped, since each subdivision has a complete road system as well as utilities such as sewage and electricity. Plaintiffs have not alleged invalid title.

The Committee was undoubtedly interested in seeing that land was regulated as an investment, but the Legislature apparently did not buy the Committee's report wholeheartedly. The Court cannot find that the legislative history, taken *in toto*, supports plaintiffs' contentions that § 11010(g) "was necessarily intended to require disclosure of speculative or investment offerings." (Plaintiffs' Brief, page 39). The Court notes that California does not have a legislative history like that of the United States Congress, where debate on the floor and House and Senate Committee hearings are published as part of the public record. In California, where no similar public record exists, the intent of the Legislature must be drawn primarily from the statutes *as enacted* by the Legislature. The Committee Report, which is filed and published, although used by the Legislature in its drafting, is by no means defini-

tive, and in fact, actual legislation often deviates from the Committee's recommendations.

Here, the statutes in question regarding disclosure of information by subdividers to be contained in the Public Report given to prospective purchasers does not speak of land in terms of investment. § 11010(g) speaks only of "use", and there is nothing in the statute itself as finally enacted, which gives this Court reason to believe that the Legislature intended required disclosure regarding "use" by a subdivider to include the intention to sell the land for investment purposes.

The other arguments plaintiffs make relate primarily to a memorandum prepared by the office of the Attorney General regarding a case where the land in question was offered only for speculation and investment. (Plaintiffs' Exhibit M–2). Because the facts of that case differ markedly from the instant action, and because the memorandum has limited precedential value, the Court does not believe it adds much to plaintiffs' argument.

The Court, therefore, concludes that the Combined Notice of Intention, Questionnaire and Application filed by defendants with DRE was properly filed and fully disclosed all information required by existing state law. There is therefore no violation of the Interstate Land Sales Full Disclosure Act since papers properly filed and accepted by the State of California are accepted by OILSR as an appropriate and complete Statement of Record, 24 CFR § 1710.25 (c).

Because the Court has found that plaintiffs have no cause of action under Count Three, there remains no federal cause of action. Therefore, the Court will grant defendants' motion to dismiss the pendant claims (Counts Four–Six) and the claim for declaratory relief (Count Seven). United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Because of this disposition of the case, the Court

need not deal with defendants' other motions.

Accordingly, it is ordered that defendants' motion for summary judgment on Count One of the complaint be, and hereby is, granted, and Count One is hereby dismissed.

It is further ordered that defendants' motion for summary judgment on Count Two of the complaint be, and hereby is, denied.

It is further ordered that defendants' motion to dismiss Count Three of the complaint be, and hereby is, granted, and Count Three is hereby dismissed.

It is further ordered that defendants' motion to dismiss Counts Four, Five, Six and Seven of the Complaint be, and hereby is, granted, and Counts Four, Five, Six and Seven are hereby dismissed.

It is further ordered that since no federal cause of action remains, the action in its entirety is hereby dismissed.

### ORDER REINSTATING ACTION

Plaintiffs have asked for a rehearing in this case in light of this Court's order of April 9, 1975, in which the Court dismissed the action. Plaintiffs have urged primarily that a cause of action under Count Two of the complaint remains, and therefore the Court should retain jurisdiction.

The Court has previously held that it had jurisdiction over the subdivisions at issue on several grounds but held that there was no remaining federal cause of action. Plaintiffs argue that the cause of action alleged in Count Two, a fraud count under the Interstate Land Sales Full Disclosure Act, remains and gives the Court a basis for federal jurisdiction. Defendants argue that 1) because the subdivisions "come close" to being exempt from the Act, the Court should

abstain from taking the case back at this juncture; 2) the subdivisions—or at least Prosser Lakeview—are in fact exempt from the Act and the Court should so hold. The Court will deal with the latter issue first.

### Exemption under the Interstate Land Sales Act

Defendants argued on rehearing that the Court's second premise for finding jurisdiction over the two subdivisions under the Interstate Land Sales Act—that the Court has no *power* at this juncture to make a determination that the subdivisions are exempt from the Act—is incorrect. The Court, upon re-examination, is more ·firmly convinced than before that its decision is correct, and that it properly has jurisdiction of the subject matter under the Interstate Land Sales Full Disclosure Act.

■■■ Defendants contend that, because 24 C.F.R. § 1710.15 provided until 1972 that:

"A developer *may* obtain an exemption advisory opinion from the Secretary as to whether an offer is exempted from the Act and the regulations in this part," (emphasis added)

the procedure of getting an opinion was discretionary (defendants' brief, page 5) with the developer, and the regulatory exemption was self-executing.[1]

§ 1710.15, which defendants refer to, does indeed provide that a developer "may" obtain an advisory opinion. However, subsection (a), which is applicable when a developer files a complete statement of record as required by § 1710.20 but claims an exemption, provides that:

"*Unless* the developer receives an opinion that the offer is exempted, the provisions of § 1710.20 (the basic registration section at issue here) *shall apply* . . ." (emphasis added)

---

1. The Court notes that defendants chose not to exercise either their "discretion" to obtain an exemption advisory opinion or to claim the exemption itself. The Court wonders how, without any claim of exemption, the exemption could "self-execute" insofar as defendants are concerned.

§ 1710.15(b) gives the developer the option of filing a "partial statement of record" supplemented by a statement of the facts and applicable law under which he claims the exemption. That form, which is laid out in § 1710.125, specifically provides that the developer must agree that "if the Secretary advises that the offering is not exempt," the developer will file in accordance with § 1710.20.

It appears from a review of all the pertinent regulations in effect at the time defendants filed that the Secretary expected the developer to bring to the Secretary's attention by either method (a) or (b) the fact that a regulatory exemption was claimed. And, the obvious import is that, upon such notice, the Secretary would review the facts to see if an exemption was in order. The regulations, read in context, support a conclusion that the exemption was *not* self-executing; that a developer had the discretion to *invoke* an exemption but, that once invoked, the Secretary had to approve that claim.[2]

▮ Therefore, the Court holds that, since no decision has been reached by the Secretary in regard to any past or potential exemption claimed by defendants for the two subdivisions at issue—Alta Sierra and Prosser Lakeview—the Court has at least tentative jurisdiction.

▮ However, defendants have made a preliminary showing on the affidavits that Prosser Lakeview was almost entirely or entirely intrastate in nature. Plaintiffs will have the burden of showing at trial that there were sufficient interstate offerings and sales to make the subdivision subject to the Act. The Court reiterates that this present finding of jurisdiction is made in light of the fact that defendants did not apply for, and the Secretary has not reviewed, any claim of exemption for either subdivision. Factual proof at trial which shows preponderantly that either subdivision was almost entirely intrastate in nature will entitle defendants to again raise the jurisdictional question.

The Court now returns to defendants' first contention: that is, even if the Court has jurisdiction, the case has so little "federal flavor" that the Court should refrain from taking back the case and allow the State to handle the matter.

▮ The Court must disagree. The Court either has jurisdiction under the Act or it does not. 15 U.S.C. § 1703 provides that:

"It shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails — . . .

"(2) in selling or leasing, or offering to sell or lease, any lot in a subdivision—

(A) to employ any device, scheme, or artifice to defraud . . . ."

In ¶ 25 of their complaint, plaintiffs have alleged that defendants violated the above quoted sections of the Act, thereby pleading a valid cause of action. The Court does not see how it can refuse to consider an adequately pled cause of action raised under a federal Act simply because there is just a "little federal flavor." The Court concludes that Count Two properly states a cause of action.

Because the Court has decided to retain jurisdiction of the case, it must face an issue which it did not decide in

2. As defendants note, under the present regulations, when a regulatory exemption is claimed, the Secretary must issue an exemption *order*. § 1710.14. The Court believes this more recent regulation simply makes more explicit that which was implicit in the earlier regulations.

its previous Order: Does the statute of limitations bar plaintiffs from pursuing their action?

## STATUTE OF LIMITATIONS

Defendants claim that all but one of the plaintiffs are barred by the statute of limitations from pursuing their causes of action under the I.L.S.A. Suit was filed in February 1973; most plaintiffs bought more than 2 years before that date, the time period defendants claim is applicable (15 U.S.C. § 1711). Several bought more than three years before the time of suit.

■ Although there is in any case lively dispute over the applicable period of time to this case (two or three years), plaintiffs argue, and the Court thinks correctly, that there is at least a question of fact presented as to whether defendants engaged in lulling or concealing activities which would toll the running of the statute.

■ In order to successfully toll the statute, plaintiffs must make a showing that defendants concealed from plaintiffs the basic facts forming a cause of action, and that plaintiffs were in ignorance of the facts through no fault of their own. Baker v. F. & F. Investment, 420 F.2d 1191 (7th Cir. 1970), City of Detroit v. Grinnell Corp., 495 F.2d 448 (2nd Cir. 1974). In the instant case, plaintiffs have alleged that, due to two factors in particular—the information disseminated in the *Alta Sierra Sentinel* and the resale program begun by Lakeworld for purchasers—plaintiffs were lulled into believing that the land they had purchased had substantial and increasing value. Plaintiffs claim that purchasers did not learn the real facts of the case—that the land was almost worthless and had no resale value—until approximately March 1973. (¶ 43 of the complaint dated March 23, 1973, states: "Plaintiffs have recently discovered that the representations which defendants made to induce plaintiffs to purchase said properties were false . . . .").

Under an alternative but closely connected theory, plaintiffs allege that, if they can show deceptive actions which continue during the course of the purchase contract, the statute cannot be considered to have begun to run until the contracts were terminated (i. e. payments completed) rather than when they were executed. *Baker, supra,* at 1200. Since most plaintiffs, if not all, have not completed payments on their installment plan, the statute would not yet have run. Plaintiffs bolster this argument by attempting to define "sale" in the same way it is defined in securities law. That is, a sale on an installment contract is not completed until the whole price has been paid (e. g. United States v. Kormel, Inc., 230 F.Supp. 275 (D. Nev.1974). The law governing the Securities Exchange Act may be an appropriate source, for the I.L.S.A. was considered "in many instances (to) parallel" the provisions of the Securities Exchange Act. (Volume 111, Congressional Record, 27310 (1965)). However, a final decision on this issue need not be reached at this time, since the Court finds that there is preliminarily a question of fact as to whether plaintiffs were lulled or deceived to a degree which might toll the statute.

A final question with which the Court must deal is whether the pendant claims (Counts Four, Five and Six) should be reinstated. Count Four states a claim parallel to that stated under Count Three of the complaint (false registration) but invokes state law. Because the Court has previously held that the registration requirements imposed by the state were not violated by defendants when they filed with the Department of Real Estate, Count Four no longer states a cause of action.

■ Counts Five and Six state causes of action for common law fraud

and breach of trust. Under United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1965), the Court has the discretion to decide if pendant state claims should be allowed; the

> "justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims . . . " 383 U.S. at 726, 86 S.Ct. at 1139.

In the instant case, plaintiffs have apparently filed a lawsuit similar to this one in state court (Defendants' April 29, 1975 brief at page 10). The Court believes, in light of that fact and in light of the potential differences in the levels of proof necessary to prove a statutory fraud claim and that necessary to prove a common law fraud count, the Fifth and Sixth Counts should not be reinstated. Judicial economy in this case would be better served by refusing to attach common law counts to the federal cause of action.

Count Seven is a count for declaratory relief and would appear to be an appropriate federal cause of action.

Last, the plaintiffs have asked that the Court refrain from making its decision on Count Three final in light of pending state decisions. The Court will abide by its previous Order in this regard.

Accordingly, it is ordered that plaintiffs' motion that the Court retain jurisdiction of this action be, and hereby is, granted on the basis that Count Two states a federal cause of action;

It is further ordered that plaintiffs' motion to reinstate the pendant causes of action (Counts Four, Five and Six) be, and hereby is, denied;

It is further ordered that Count Seven be, and hereby is, reinstated;

It is further ordered that this Court's Order of April 9, 1975 be, and hereby is, revised to the extent indicated in this Order.